1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                    )
    United States of America,        )   File No. 21-MJ-315(1)
4                                    )   (KMM)
              Plaintiff,             )
5                                    )   Via Zoom
    vs.                              )   Teleconference
6                                    )
    Joshua Cameron Hanes,            )   May 18, 2021
7                                    )   2:21 p.m.
              Defendant.             )
8                                    )
    ------------------------------------------------------------
9
                  BEFORE THE HONORABLE JON HUSEBY
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
            **(PRELIMINARY EXAMINATION AND DETENTION HEARING)**
11
    APPEARANCES
12    For the Plaintiff:        Assistant United States Attorney
                                AMBER BRENNAN, AUSA
13                              300 South Fourth Street
                                Suite 600
14                              Minneapolis, Minnesota 55415

15    For the Defendant:        Behrenbrinker Law Firm
                                JAMES R BEHRENBRINKER, ESQ.
16                              412 South Fourth Street
                                Suite 1050
17                              Minneapolis, MN 55415

18    Court Reporter:           MARIA V. WEINBECK, RMR-FCRR
                                1005 U.S. Courthouse
19                              300 South Fourth Street
                                Minneapolis, Minnesota 55415
20

21

22
         Proceedings reported by court reporter; transcript
23    produced by computer.

24

25

1                              **I N D E X**

2

3    **Government Witness:**                                    **Page**

4    **CALEB HOISINGTON**

5            Direct Examination by Ms. Brennan          9

6            Cross Examination by Mr. Behrenbrinker     21

7            Redirect Examination by Ms. Brennan        43

8            Recross Examination by Mr. Behrenbrinker   44

9

10   **Defense Witness:**

11

12   **JOSHUA CAMERON HANES**

13           Direct Examination by Mr. Behrenbrinker    57

14

15            *      *      *      *      *      *

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2                         **IN OPEN COURT**

3                          **(2:21 p.m.)**

4                 THE COURT:  Good afternoon.  Today's date is

5     May 18, 2021.  It's approximately 2:20 p.m.  My name is

6     United States Magistrate Judge Jon Huseby.  I'll call the

7     matter of United States of America versus Joshua Cameron

8     Hanes, Case Number 21-MJ-315.

9                 Mr. Hanes, we're here today for your detention and

10    preliminary hearing, but before I get to that, I'd like to

11    go over a couple things with you if I might.  Could you

12    please, to start off with, could you please go around the

13    screen and identify who you see on the screen in front of

14    you?

15                THE DEFENDANT:  I see Jordan Pickrom.  I see

16    Maribel An -- I don't want to misinterpret her last name.  I

17    see Maria Weinbeck, and I see my lawyer James, then I see

18    you, Your Honor.  I see Amber Brennan, and I see Caleb, and

19    I see Duty Chambers and two phone calls.

20                THE COURT:  Okay.  If at any point in time during

21    the proceeding today if you can't see us, could you please

22    speak up so I could stop the hearing and we'll get that

23    technical glitch fixed.  As you've seen, we've already had a

24    little bit of an issue here today so if that happens, could

25    you speak up and let me know?

```
 1            THE DEFENDANT:  Yes, Your Honor, I will.
 2            THE COURT:  Okay.  The next thing I'd like to do
 3     is go around the room real quick, if everybody could at
 4     least say something to verify that Mr. Hanes can hear you.
 5     You can obviously hear me because you are responding to my
 6     questions.
 7            So, Ms. Pickrom, could you please say "hello."
 8            MS. PICKROM:  Good afternoon, Your Honor.
 9            THE COURT:  Ms. Andrade?
10            MS. ANDRADE-VERA:  Good afternoon, Your Honor.
11            THE COURT:  Ms. Court Reporter, I don't think we
12     need you to say hello, but you're doing a good job.
13            Mr. Behrenbrinker?
14            MR. BEHRENBRINKER:  Good afternoon, Your Honor.
15            THE COURT:  Thank you.  Ms. Brennan?
16            MS. BRENNAN:  Good afternoon, Your Honor.
17            THE COURT:  Officer Hoisington?
18            OFFICER HOISINGTON:  Good afternoon, Your Honor.
19            THE COURT:  Okay, perfect.  So, again, similarly
20     if at any point in time you can't hear us or if I cut out, I
21     need you to start waving your hands, so I could see that
22     something is going wrong, and I'll stop it.  Okay?
23            THE DEFENDANT:  Yes, Your Honor.
24            THE COURT:  And if at any point in time in the
25     hearing today, you need to have a sidebar or break out
```

1    session with your attorney, please indicate to me, "Judge, I

2    need a little break to talk with my attorney."  I will stop

3    the proceeding and will make arrangements for that, okay?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Thank you.

6              THE DEFENDANT:  Thank you.

7              THE COURT:  The next thing I would like to cover

8    with you is what's called "Consent."  Obviously, we're doing

9    this by video teleconferencing today.  In a usual scenario,

10   we'd be in an actual courtroom face-to-face, but due to the

11   pandemic, it's forced us to change the way we do certain

12   things and trying to avoid the spread of this pandemic.

13             So what I would like to do is ask for your consent

14   to proceed today by video teleconferencing?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Okay.  I will make a determination

17   that Mr. Hanes has consented to proceeding today by video

18   teleconferencing.

19             Counsel, could you please state your names for the

20   record after me going through all of that.

21             MS. BRENNAN:  Good afternoon.

22             THE COURT:  Start with the government, yep.

23             MS. BRENNAN:  Good afternoon, Your Honor.  Amber

24   Brennan appearing in place of David Steinkamp for the United

25   States.

1          THE COURT:  Thank you.

2          MR. BEHRENBRINKER:  Good afternoon, Your Honor.

3     James Behrenbrinker for the defense representing Mr. Hanes,

4     who is also present by way of the Zoom video.

5          THE COURT:  Thank you.  Now, Mister, am I

6     pronouncing it right, Behrenbrinker?

7          MR. BEHRENBRINKER:  That's great, Your Honor.

8          THE COURT:  Mr. Behrenbrinker, are you and your

9     client, are you contesting probable cause?

10         MR. BEHRENBRINKER:  Thanks for asking that.  I

11    wanted to mention he's charged with -- Mr. Hanes is charged

12    with three counts in a Complaint.  Count I is Felon in

13    Possession of a Firearm.  Count II relates to Felon in

14    Possession of a Firearm; and Count III is Possession of More

15    Than 40 Grams of Methamphetamine With Intent to Distribute,

16    I believe.  We are not contesting probable cause related to

17    Count II and III, for the purpose of this preliminary

18    hearing.  We are contesting probable cause only as to

19    Count I of the Complaint.

20         THE COURT:  The Felon in Possession count?

21         MR. BEHRENBRINKER:  Correct, Your Honor.

22         THE COURT:  Ms. Brennan?  Do you have a, since

23    there's been a contest in regards to Count I, do you have a

24    witness in order to prove that up?

25         MS. BRENNAN:  I do, Your Honor, but I guess, and I

1     didn't know until just now that the defense intended to not

2     contest probable cause on all three of the counts, but I

3     guess my initial reaction would be do we need to have a

4     preliminary hearing on one count when there is PC on two of

5     the other counts?  It's just a Complaint.  Do you have a

6     position --

7                THE COURT:  Mr. Behrenbrinker, go ahead, I know

8     you wanted to speak up.  Go ahead.

9                MR. BEHRENBRINKER:  I think we do need a

10    preliminary hearing, Your Honor.  Counts II and III relate

11    to the same date and the same situation.  Count I is a

12    completely separate date.  As I recall from looking at the

13    Complaint, that allegedly occurred on December 4th, 2020,

14    while the activity in Count II and III occurred on March 22,

15    2021.  Count I occurred in Ramsey County, Minnesota;

16    Counts II and III occurred in Dakota County, Minnesota, they

17    are separate and distinct events, separate and distinct

18    incidents which require a finding of probable cause to

19    determine whether or not the charge can even go forward and

20    that's, as I understand it, that's the purpose of a

21    preliminary hearing or, in other words, a probable cause

22    hearing.  We're --

23                THE COURT:  Go ahead, I'll let you finish your

24    thought.

25                MR. BEHRENBRINKER:  I was just going to say that

1    we're contesting Count I, and we're essentially waiving

2    probable cause or contesting probable cause as to Counts II

3    and III.

4              THE COURT:  I think we should proceed with the

5    probable cause portion of Count I.  Ms. Brennan, are you

6    okay with proceeding with it that way?

7              MS. BRENNAN:  Yes, Your Honor.

8              THE COURT:  Okay, why don't we go forward with

9    that route.

10             MS. BRENNAN:  All right.  Thank you, Your Honor.

11   The government is going to elicit testimony from one

12   witness.  That's Agent Hoisington and then we would just ask

13   to be heard on the issue of detention after that as well.

14   And on detention, Your Honor, we'll primarily just be

15   arguing from the record in the bond report.

16             THE COURT:  Okay.

17             MS. BRENNAN:  All right.  The government calls

18   Caleb Hoisington.

19             THE COURT:  Officer Hoisington, could you please

20   raise your right hand?

21             OFFICER HOISINGTON:  Yes, Your Honor.

22                        **CALEB HOISINGTON,**

23             After having been sworn by the Court, testified as

24   follows:

25             THE COURT:  Go ahead, Ms. Brennan.

```
1            MS. BRENNAN:  Thank you.
2                    DIRECT EXAMINATION
3    BY MS. BRENNAN:
4    Q.  Mr. Hoisington, can you spell your last name for the
5    record, please, your first and last names?
6    A.  Yes, ma'am.  My name is Caleb Hoisington.  First name
7    C-a-l-e-b, last name is H-o-i-s-i-n-g-t-o-n.
8    Q.  Thank you.  What is your occupation?
9    A.  I'm a special agent with the ATF.
10   Q.  And that's the United States Bureau of Alcohol, Tobacco,
11   Firearms and Explosives?
12   A.  Yes, ma'am.
13   Q.  How long have you been a special agent with the ATF?
14   A.  Since March of 2020.
15   Q.  So just over a year?
16   A.  Yes, ma'am.
17   Q.  And what are your duties as a special agent with the
18   ATF, generally?
19   A.  Well, as a special agent with the ATF, we primarily
20   investigate federal firearms investigations.
21   Q.  Do you have -- did you receive any training on
22   investigations or firearms related investigations when you
23   joined the ATF?
24   A.  Yes, ma'am, I did.
25   Q.  Can you describe that training?
```

1    A.  Yep, so I spent six months at the Federal Law

2    Enforcement Training Center in Glenco, Georgia, and three of

3    those months, approximately half of it, was dedicated to a

4    general criminal investigators training program where we

5    were taught things such as Constitutional law, arrest

6    techniques and firearms; and then the last portion of that

7    was the ATF specific program, which is considered the

8    special agent basic training program where we were taught

9    more specifics about ATF's criminal investigations, such as

10   arson and explosives, along with federal firearms

11   violations.

12   Q.  All right.  You're familiar with the case we're here

13   about today, United States of America versus Joshua Hanes?

14   A.  Yes, ma'am.

15   Q.  Is this what is known within ATF as an adoptive case?

16   A.  That is correct.

17   Q.  And, generally speaking, what's an adoptive case?

18   A.  Well, an adoptive case generally refers to, so we work

19   very closely with our state and local partners and adoptive

20   cases where we get referred a case from our state locals,

21   and so then I review and obtain all officer reports or lab

22   reports, whatever that is, and then I take that and I

23   present it to the United States Attorney's Office for

24   federal prosecution, and if the case is then accepted, then

25   we move forward with and then I bear responsibility of all

1    further investigative techniques and services, such as

2    search warrants, arrest warrants, and we see through the

3    close of the case.

4    Q.  Okay.  So an adoptive case is essentially a case that

5    the ATF is picking up that was started by state or local law

6    enforcement?

7    A.  Yes, ma'am.

8    Q.  And that is in contrast to a case where, for example,

9    you would be initiating and conducting an investigation just

10   from ATF?

11   A.  That is correct.

12   Q.  Okay.  And so in this case, it's a case that was adopted

13   by ATF and you're the case agent on the case, correct?

14   A.  Correct.

15   Q.  So as part of adopting this case, did you review the

16   reports that were generated by local law enforcement who

17   were involved in the events that are alleged in the

18   Complaint?

19   A.  I did.

20   Q.  Okay.  And did you -- are you the affiant on the

21   Complaint, on the affidavit that supports the Complaint in

22   this matter?

23   A.  Yes, ma'am.

24   Q.  Okay.  And so what you're testifying about today, is it

25   fair to say that you're testifying based on information that

1    you gathered from reviewing the reports and investigation

2    efforts of other law enforcement agencies?

3    A.  Correct.

4    Q.  Okay.  With respect to, I think you just heard it

5    indicated that the defendant is waiving probable cause with

6    respect to Counts II and III, so if we're focusing on

7    Count I of the indictment or of the Complaint, that is an

8    incident that occurred on December 4th of 2020; is that

9    right?

10   A.  Yes, ma'am.

11   Q.  Okay.  All right.  So can you describe what -- let me

12   ask you this, who was the main investigative agency on the

13   incident that occurred on December 4th?

14   A.  It was the St. Paul Police Department.

15   Q.  Okay.  And have you reviewed the reports that were

16   generated as a result of that incident by St. Paul police?

17   A.  I have.

18   Q.  And have you also had any followup conversations with

19   any of the officers or investigators in St. Paul?

20   A.  Yes, ma'am, I have.

21   Q.  Okay.  So based on your review of the materials, can you

22   describe what happened on December 4, 2020, as it relates to

23   Mr. Hanes?

24   A.  Yep.  So on December 4th of 2020 at approximately

25   10 o'clock in the morning, a 911 caller called in stating

1    that she heard gunshots in the back of her complex, and she
2    stated that there was a maroon vehicle parked in the
3    alleyway with an individual inside of it.  So officers were
4    dispatched to that area on Seminary Avenue, and they came
5    across this maroon vehicle or SUV-type vehicle in the
6    alleyway and --
7    Q.  Special Agent Hoisington, did the caller say whether or
8    not she knew if the vehicle had been involved in the
9    shooting?
10   A.  Ma'am, she said that she was uncertain whether or not
11   the vehicle was involved in the shooting or the gun shots
12   that she heard.  She just notified 911 that there was a
13   vehicle in the alleyway.
14   Q.  All right.  So what happened when officers responded to
15   that alleyway?
16   A.  So when officers came to the alleyway, they identified
17   this maroon SUV and an individual inside of it, and they
18   commanded the individual to exit the vehicle to which the
19   individual, Mr. Hanes, did, and that when he got out of the
20   vehicle, he remained standing outside of the driver's door
21   to dig in the vehicle.  According to the reports, it was he
22   appeared to be digging in towards the passenger side of the
23   vehicle so --
24   Q.  At this point, Special Agent Hoisington, had the
25   individual been identified as Mr. Hanes or did that happen

1    later?

2    A.   That happened later on.

3    Q.   Okay.  He was eventually arrested, right, and identified

4    at that time?

5    A.   Correct.

6    Q.   Okay.  So was there anyone else in the vehicle?

7    A.   No, ma'am.

8    Q.   All right.  So please continue with where you left off

9    as the person Mr. Hanes was digging in the vehicle.  Can you

10   describe that a little bit more?

11   A.   Yep.  So, again, officers were giving verbal commands

12   while Mr. Hanes was digging inside the vehicle and

13   disregarding verbal commands and, again, this was a shots

14   fired call, so officers approached Mr. Hanes, and he was in

15   their reports making furtive movements as if he were looking

16   for a means of escape, and they were able to detain him at

17   that moment by his vehicle and pat search him for officer

18   safety.

19   Q.   Did they find anything when they pat searched him?

20   A.   They felt a hard object within one of his pockets, which

21   they potentially suspected to be a weapon of some sort, and

22   so they removed that item to find a glass pipe with

23   suspected methamphetamine residue inside of it.

24   Q.   Okay.  So what happened next?

25   A.   So then as officers were escorting Mr. Hanes back to

1     their squad car, Mr. Hanes broke free and ran.  He fled on

2     foot, and Mr. Hanes eventually doubled back to the front of

3     the address that he was sitting behind in the alleyway,

4     again, an address off of Seminary Avenue, and he gained

5     entrance into the porch and began kicking the door into the

6     house in order to gain entry into the home.

7     Q.  What happened at that point?

8     A.  So officers were able to catch up to him and give him

9     verbal commands for him to get on the ground, and Mr. Hanes

10    complied at that moment and got on the ground, and they were

11    able to place him in handcuffs and detain him then.

12    Q.  All right.  And so after Mr. Hanes was detained, what

13    did officers do next?

14    A.  They pat searched him again and found a bag of suspected

15    methamphetamine in his coin packet.

16    Q.  Okay.

17    A.  And so then from there, officers escorted Mr. Hanes back

18    to their squad car, and it was at this moment that the

19    officers notified St. Paul PD or police department of this

20    and that they were notified by a sergeant at St. Paul Police

21    Department that Mr. Hanes was caught in the same vehicle a

22    few weeks prior with two firearms recovered from that

23    vehicle.

24    Q.  Okay.  Now you just testified that the officers notified

25    St. Paul PD, I mean they were St. Paul officers, correct?

1   A.  Yes, ma'am.  Yep, they notified specifically the Gang

2   Unit, Gang and Gun Unit, who was familiar with Mr. Hanes.

3   Q.  I see.  And so they learned that there had been an

4   arrest.  It had been in November of 2020, correct, of

5   Mr. Hanes involving that vehicle and there were two firearms

6   recovered at that time?

7   A.  Yes, ma'am.

8   Q.  So what did officers do at this point?

9   A.  So they went and searched the immediate area accessible

10  to the driver in the vehicle, and on account of Mr. Hanes

11  previously digging in the vehicle when the officers first

12  approached, and they discovered a bag or a purse on the

13  front passenger floor board of that vehicle.

14  Q.  Okay, and did they look inside the purse or bag?

15  A.  They did, and they found a Springfield 9 mm handgun in

16  there with an extended or a high capacity magazine with live

17  rounds in the magazine and one in the chamber.

18  Q.  Are you aware of whether that there's been any DNA

19  testing on that firearm?

20  A.  Yes, ma'am.  So the St. Paul Police Department took

21  swabs from that handgun from the textured hand grip area and

22  the slide of that firearm and submitted it to the BCA or

23  Bureau of Criminal apprehension for DNA testing.

24  Q.  Have they gotten results from that testing?

25  A.  Yes, they did, and those results are on the textured

1    hand grip, the DNA came back that Mr. Hanes could not be

2    excluded from the major DNA mixture, and they also stated

3    that 98.8 percent of the general population can be excluded,

4    and they also stated that on the slide of the handgun,

5    Mr. Hanes can also not be excluded from the major DNA

6    mixture but 94 percent of the general population can be.

7    Q.  Okay.  Have you had occasion to review Mr. Hanes'

8    criminal history?

9    A.  I have.

10   Q.  All right.  And do you know whether Mr. Hanes has any

11   prior convictions that would prohibit him from possessing a

12   firearm under federal law?

13   A.  Yes, ma'am, he does.

14   Q.  All right.  He has several felony convictions, correct?

15   A.  Correct.

16   Q.  And he also has a misdemeanor conviction for domestic

17   assault; is that right?

18   A.  Correct.

19   Q.  And would those convictions prohibit him from possessing

20   a firearm under federal law?

21   A.  Yes, ma'am.

22   Q.  Okay.  And did you happen to notice whether any --

23   whether Mr. Hanes had been sentenced to prison on any of his

24   prior convictions?

25   A.  Yes, he had been.

```
 1    Q.  And do you remember any of those convictions where he

 2    was sentenced to prison?

 3    A.  Ma'am, if I could reference my notes, that would be

 4    helpful on the specific sentencing.

 5    Q.  Well, let me just ask you, are you aware of a conviction

 6    in 2011 for Second Degree Assault With a Dangerous Weapon?

 7    A.  Yes, ma'am.

 8    Q.  And do you recall was Mr. Hanes sentenced to 39 months

 9    in prison on that conviction?

10    A.  Yes, I do recall that.

11    Q.  Okay.  So that's back in 2011.  Are you aware of whether

12    he was convicted in 2017 on two counts of Felony Theft?

13    A.  Yes, ma'am.

14    Q.  And sentenced to prison for 21 months and 22 months on

15    those counts; is that right?

16    A.  Yes, ma'am.

17    Q.  And in 2017, he was also convicted of Fleeing Police in

18    a Motor Vehicle and sentenced to 17 months in prison; is

19    that right?

20    A.  Correct.

21    Q.  Okay.  And then also in 2017, there was one more

22    conviction and that was Fleeing Police in a Motor Vehicle,

23    and he was sentenced to 20 months on that one, correct?

24    A.  Correct.

25    Q.  Okay.  And on those convictions that we just talked
```

1     about, those last three that were 2017-ish, is it your

2     understanding that Mr. Hanes at least on a couple of them

3     had, well, on all three had received stayed sentences but

4     then those were all executed together because of probation

5     violations in 2019?

6     A.  Yes, I believe so.

7     Q.  Okay.  And so on his misdemeanor domestic violence he

8     was sentenced to 90 days in jail; is that right?

9     A.  Correct.

10    Q.  Okay.  Originally, a shorter sentence but again because

11    of probation violations, he ended up 90 days, right?

12    A.  Yes.

13    Q.  So is it your understanding based on that record that

14    Mr. Hanes was aware that he had been convicted of at least

15    one crime that could get him sentenced by something more

16    than a year in prison?

17    A.  Yes, that is my belief.

18    Q.  And based on the fact that he went to jail on his

19    misdemeanor domestic, he was also aware that he had that

20    conviction as well?

21    A.  Yes, ma'am.

22    Q.  Okay.  And what type of gun was recovered from the

23    vehicle on December 4th of 2020?

24    A.  It was a Springfield XD.

25    Q.  Have you had a chance to talk with a firearms expert --

1    well, let me ask you this, ATF has firearms experts, right,

2    who are knowledgeable about where different guns are

3    manufactured?

4    A.  Correct.

5    Q.  Have you had a chance to talk to a firearms expert at

6    ATF to determine whether or not the -- where the Springfield

7    handgun was manufactured?

8    A.  I have.

9    Q.  What did you learn?

10   A.  That the Springfield XD handguns are manufactured

11   outside the State of Minnesota.

12   Q.  Okay.  Where are they manufactured?  Or where are they

13   assembled I should say?

14   A.  The XDs are manufactured in Croatia actually.

15   Q.  Okay.  And so based on that information, you believe

16   that this firearm would have travelled across state lines

17   before it arrived in Mr. Hanes' possession on December 4th

18   of 2020?

19   A.  Yes, ma'am.

20   Q.  Okay.  There's a lot more information that you've

21   gathered in connection with the investigation concerning

22   Mr. Hanes; is that correct?

23   A.  That is correct.

24   Q.  And you haven't testified as to every fact you know

25   about the investigation.  You just testified about facts

1    that you believe establish probable cause for Count I of the

2    Complaint?

3    A.  Yes, ma'am.

4         MS. BRENNAN:  Okay.  I don't have any further

5    questions right now.  Thank you.

6         Your Honor, and just to let you know,

7    Mr. Behrenbrinker had forwarded Special Agent Hoisington's

8    report and also a copy of the Complaint that

9    Mr. Behrenbrinker wanted to use as exhibits in the hearing.

10   I have forwarded those to Special Agent Hoisington, and he

11   has those printed out so that he can answer questions about

12   those documents should Mr. Behrenbrinker ask them.

13        MR. BEHRENBRINKER:  Your Honor, may I inquire?

14        COURT REPORTER:  I'm sorry, Your Honor, you're on

15   mute.

16        THE COURT:  I'm sorry, I was muted there for a

17   second.  We have to go one at a time.  I can see the court

18   reporter starting to get mad at me.

19        I appreciate that, Ms. Brennan, for providing him

20   the documents.  Mr. Behrenbrinker, you can proceed with your

21   cross-examination.

22        MR. BEHRENBRINKER:  Okay, thank you, Your Honor.

23                      **CROSS EXAMINATION**

24   BY MR. BEHRENBRINKER:

25   Q.  Special Agent Hoisington, you stated that you had been a

1    special agent with the ATF since approximately March of

2    2020, is that correct?

3    A.  Yes, sir.

4    Q.  And you also discussed that one of the -- I guess it was

5    one of the first things you did after being appointed or

6    hired into your position as a special agent with the ATF was

7    to attend --

8              (Unidentified noise in background.)

9              MR. BEHRENBRINKER:  I'm getting a bunch of

10   background noise, are you guys getting that?

11             MS. BRENNAN:  It's probably from the jail.  It's

12   pretty common.

13             THE COURT:  Mr. Hanes, do you see a mute button on

14   yours so we can't hear you?  You know what I'm saying?

15             THE DEFENDANT:  No, there's not, Your Honor.

16             THE COURT:  Okay.  I think we'll just have to bear

17   with it, Mr. Behrenbrinker.

18             MR. BEHRENBRINKER:  I didn't know if that was my

19   machine screwing up or what.

20             THE CLERK:  I just muted him.

21   MR. BEHRENBRINKER:

22   Q.  Back to my question, Special Agent, one of the first

23   things you did after being appointed or hired into your

24   position was to attend training put on by the United States

25   government; is that correct?

1    A.  Yes, sir.

2    Q.  And I believe you testified that among other things you

3    received training in connection with I believe you referred

4    to is at Constitutional law, is that correct?

5    A.  Yes, sir.

6    Q.  Can you just -- I'm not going to go through the whole

7    course, but I'm just curious, did the focus as far as

8    Constitutional law, did you have a focus on the Fourth

9    Amendment of the United States Constitution?

10   A.  Yes, sir, we did.

11   Q.  Are you familiar with some precedential or seminal

12   Supreme Court cases relating to the Fourth Amendment such as

13   search and seizure?

14   A.  Yes, sir.

15           MS. BRENNAN:  Your Honor, I'm going to object to

16   this line of questioning.  You know, with respect, this is a

17   probable cause hearing on the Complaint.  To the extent that

18   Mr. Behrenbrinker wants to challenge the legality of the

19   search of the vehicle under Fourth Amendment grounds, that's

20   something that he can do at a suppression hearing, but it's

21   not an appropriate line of inquiry for a probable cause

22   hearing.

23           THE COURT:  Mr. Behrenbrinker?

24           MR. BEHRENBRINKER:  I think it is appropriate to

25   the extent that I'm not planning on talking to him about the

1    search, but I am planning on talking to him about the

2    initial stop.  It was a Terry stop, and I believe I have a

3    right at this if there wasn't reasonable suspicion to stop

4    and initially search whether you call it a protective

5    pat-down search or what have you, it is governed by *Ohio v.*

6    *Terry*, and he said this witness set forth in an affidavit

7    application for a search warrant and a Criminal Complaint.

8              The purpose of this hearing, as I understand it, is

9    to determine whether or not there's probable cause for

10   Count I to go forward.  I contend, or the defense contends,

11   that we have a right to examine this witness to make a

12   determination whether or not there was reasonable

13   articulable suspicion on the part of an objective police

14   officer to even stop Mr. Hanes in the first place, whether

15   it be a Terry stop or a Terry investigative stop or whatever

16   the government wants to call it.  And if it isn't, which we

17   contend there wasn't reasonable suspicion, then there can't

18   be probable cause, and the case can't go forward, must be

19   dismissed now.

20             THE COURT:  I will overrule the objection and

21   allow you to make a brief inquiry here.

22             MR. BEHRENBRINKER:  Thank you.

23   BY MR. BEHRENBRINKER:

24   Q.  As part of your training, Special Agent, were you

25   trained in how to make a warrantless arrest?

1    A.  Yes, sir, we were.

2    Q.  Well, let me back up a little bit.  We'll get into some

3    of that in a little minute, but the government's attorney

4    had you describe this case as an adoptive case.  Do you

5    recall that?

6    A.  Yes, sir.

7    Q.  I believe you testified when the federal government

8    adopts a case from what you referred to as one of your state

9    or local partners, part of your normal ordinary procedure

10   before you present the case to the United States Attorney's

11   Office is to read all -- is to collect, review, analyze all

12   police reports and supplemental reports that are generated

13   by the investigating partner; is that correct?

14   A.  Yes, sir.

15   Q.  And in this case here, the local partner was the St.

16   Paul Police Department, correct?

17   A.  Yes, sir.

18   Q.  And so in this case, did you collect, review, analyze

19   all police reports and supplemental reports generated by the

20   St. Paul Police Department?

21           MS. BRENNAN:  Your Honor, I object based on

22   relevance.

23           MR. BEHRENBRINKER:  In connection with this case?

24           THE COURT:  You have to let him finish the

25   question and then the objection before the answer.  So you

1    object based on relevance, Mr. Behrenbrinker?

2            MR. BEHRENBRINKER:  I didn't object, the lawyer

3    for the government did.

4            THE COURT:  Right.  Do you have a response to her

5    objection?

6            MR. BEHRENBRINKER:  Well, it's certainly relevant

7    because he's testified on direct examination to information

8    that's contrary or in addition to what's in his affidavit,

9    and I want to get into his affidavit and his reports, but I

10   want to have a clear understanding as to what exactly he did

11   in this case.

12           He's the case agent.  He's the government's

13   principle witness.  He's their only witness today.  He's the

14   one who said that he, on direct exam, that he reviewed all

15   reports, and he even went further than that.  He followed up

16   and talked to specific officers about any questions he might

17   have had regarding any information in the reports.  And

18   based on that information, he has testified on direct exam

19   here today, and I should have a right to inquire into that

20   and to determine whether, you know, whether or not he

21   actually followed his procedures and so on.

22           THE COURT:  Ms. Brennan?

23           MS. BRENNAN:  Your Honor, my response would be

24   that he's expanding the scope and trying to somehow -- well,

25   I don't know what he's trying to do, but I would request

1   that if Mr. Behrenbrinker has a specific question about what

2   Special Agent Hoisington found out, he should ask that

3   rather than reiterate or emphasize whether or not he read

4   every single report that exists.

5          THE COURT:  So in regards to the objection, I'll

6   overrule the objection.  Mr. Behrenbrinker, you can

7   continue.

8          MR. BEHRENBRINKER:  Thank you, Your Honor.

9   BY MR. BEHRENBRINKER:

10  Q.  Did you read all of the police reports that were

11  generated in this case?

12  A.  Sir, yes, I read all that was sent to me for this case.

13  Q.  Did you ask for everything?

14  A.  I did.

15  Q.  Did you also pick up the phone or go personally to have

16  conversations or followup conversations with St. Paul Police

17  Department, officers who were involved in the investigation

18  of this case?

19  A.  Officers that were involved in the investigation, yes,

20  sir, I did.

21  Q.  And was the purpose of that to ask any questions that

22  you might have based upon your review of the information

23  contained in the reports that you read?

24  A.  Yes, sir.

25  Q.  And then based upon those conversations and as well as

1    your review of all of the police reports, you prepared

2    what's been identified and produced to your attorney as

3    Defendant's Exhibit Number 1, and do you have that in front

4    of you, sir?

5    A.  Yes, sir.

6    Q.  It's your report of investigation number one?

7    A.  Yes, sir.

8    Q.  You prepared that; is that correct?

9    A.  I did.

10   Q.  Now, the copy that your lawyer gave me is not signed or

11   dated.  Do you recall off the top of your head when you

12   prepared this report?

13   A.  Sir, off the top of my head I do not.  I can reference a

14   note and get you that date.

15             MS. BRENNAN:  Your Honor, I'm going to object to

16   the line of questioning about Special Agent Hoisington's

17   report.  We're here for probable cause on the Complaint, and

18   so for Mr. Behrenbrinker to want to get into what Special

19   Agent Hoisington submitted in an opening report to the

20   government is really not relevant.

21             MR. BEHRENBRINKER:  It's relevant to the extent,

22   Your Honor, he used that report to prepare an affidavit in

23   support of his application of a search warrant, excuse me,

24   not a search warrant but for a Complaint and for an arrest

25   warrant.  And I'm only laying foundation for getting into

```
 1    his affidavit, Your Honor.
 2              THE COURT:  Ms. Brennan?
 3              MS. BRENNAN:  Special Agent Hoisington has
 4    testified that he completed the Complaint Affidavit based on
 5    reports that he reviewed from the St. Paul Police Department
 6    and the investigating agencies.  The report that he
 7    compiled, his summary in essence that he submitted to the
 8    United States to my office is something that I provided to
 9    Mr. Behrenbrinker in an abundance of caution that he would
10    consider it to be Jencks, and so I provided it to him but
11    I'm going to go back to the report is not what's relevant
12    here.  What's relevant is what's in the affidavit?  Is there
13    probable cause or not?
14              MR. BEHRENBRINKER:  Thank you, counsel, I
15    appreciate that.
16              THE COURT:  I will sustain the objection.
17    BY MR. BEHRENBRINKER:
18    Q.  Special Agent Huseby, referring --
19              THE COURT:  I'm Judge Huseby not Special Agent.
20              MR. BEHRENBRINKER:  Sorry, I apologize, Your
21    Honor.  I never appeared in front of you before, and so
22    sorry, I apologize.
23              THE COURT:  No, you're fine, you're fine.
24    Q.  Special Agent Hoisington?
25    A.  Yes, sir.
```

1    Q.  Okay.  I have another question for you, Judge -- no,

2    never mind.

3              Did you use your report in order to prepare your

4    affidavit?

5    A.  Yes, sir.

6    Q.  Does your affidavit essentially track the information in

7    your report?

8    A.  It does.

9              MS. BRENNAN:  Objection, relevance.

10             THE COURT:  Overruled.

11   BY MR. BEHRENBRINKER:

12   Q.  Now in your affidavit that's Defense Exhibit Number 2,

13   do you have that in front of you, sir?

14   A.  Yes, sir, I do.

15   Q.  Okay.  Looking at the introduction section, midway

16   through the first paragraph, you state that "the facts and

17   information contained in this affidavit are based upon your

18   own personal investigation and observations and those of

19   other agents and law enforcement officers involved in the

20   investigation," did I read that correctly?

21   A.  You did.

22   Q.  Okay.  Now, did you rely upon the information in your

23   report as well as your conversations with St. Paul Police

24   Department as well as your review of all of the Saint Paul

25   Police Department reports, police reports in order to

1     prepare your affidavit?

2     A.  I did.

3     Q.  And is your affidavit -- was it your intent to set forth

4     a full and complete affidavit?

5     A.  Sir, it was enough to set forth to provide enough -- it

6     was not exhaustive but it was set forth to provide enough

7     for probable cause, yes, sir.

8     Q.  And you were taught when you were trained by the ATF

9     that it's important to have -- to prepare an affidavit

10    that's complete, particular, articulate, so that the

11    reviewing magistrate can make a determination as to whether

12    or not there is in fact probable cause to either issue a

13    search warrant, an arrest warrant or a Complaint; is that

14    correct?

15    A.  Correct.

16    Q.  Now, referring to the section of your affidavit related

17    to probable cause, that's essentially the same as what's in

18    your report; is that correct?  And as far as your report,

19    looking at page, starting on page 2 with a subheading

20    "December 4, 2020," paragraph numbers 12, 13, 14, I'm mostly

21    interested in paragraph 13.

22              Did you take that information from your report

23    almost directly or verbatim in order to prepare your

24    affidavit for the Court?

25    A.  Yes, sir.

```
1            MS. BRENNAN:  I'm going to object again based on
2     relevance.
3            THE COURT:  Overruled.
4     BY MR. BEHRENBRINKER:
5     Q.  Now, you have your affidavit in front of you, sir?
6     A.  I do, sir.
7     Q.  Okay.  Referring you to paragraph 3, it states that
8     "your affiant learned on December 4, 2020, at about
9     10:00 a.m., the St. Paul Police Department officers
10    responded to an area on seminar avenue in St. Paul to a
11    shots fired call."  Did I read that correctly?
12    A.  You did.
13    Q.  "The 911 caller reported there was a man in a maroon
14    vehicle in the alley but it was unknown whether or not the
15    vehicle was involved in the shooting."  Did I read that
16    correctly?
17    A.  Yes, sir.
18    Q.  And are those your words?
19    A.  They are.
20    Q.  And those words are taken directly from your report
21    correct?
22    A.  Correct.
23    Q.  And your report is based upon your review of all of the
24    St. Paul police reports, supplemental reports as well as
25    your conversations with St. Paul Police Department police
```

1    officers who were involved in the investigations; is that

2    correct?

3    A.  Yes, sir.

4    Q.  Now, let's go to paragraph 4.  "Officers approached a

5    maroon Chevrolet Tahoe, Minnesota license plate 970 XHM in

6    the alley," did I read that correctly?

7    A.  You did.

8    Q.  "And an individual later identified as Joshua Cameron

9    got out of the vehicle, looked around and made furtive

10   movements as if he were going to flee," did I read that

11   correctly?

12   A.  Yes, sir.

13   Q.  Now that set was taken directly from your police reports

14   or from your ROI number 1 based upon your review of all of

15   the police reports from St. Paul as well as all of your

16   conversations with the officers in St. Paul; correct?

17   A.  Yes, sir.

18   Q.  And to the best of your knowledge, what you wrote in

19   paragraph 4 was truthful and accurate and to the point,

20   correct?

21   A.  Yep.

22   Q.  And then going to paragraph 5, it states, "officers

23   quickly detained Hanes and pat searched him for weapons,"

24   correct?  Did I read that correctly?

25   A.  Yes, sir.

Behrenbrinker - Cross-Examination

1    Q.  Now, and that was taken directly from your report,

2    correct?

3    A.  Yes, sir.

4    Q.  And, again, your report or ROI-1 was based upon your

5    careful review of all of the police reports as well as all

6    of your conversations with the investigating officers, with

7    your local partner the St. Paul Police Department, is that

8    correct?

9              MS. BRENNAN:  Objection, asked and answered.

10             THE COURT:  Sustained.

11   BY MR. BEHRENBRINKER:

12   Q.  Now, going back to paragraph 3, would you agree that

13   nowhere in your affidavit, nowhere in your report does it

14   reference that the man who got out of -- or strike that.

15             Nowhere in your report or in the affidavit does it

16   state that shots were fired in the back yard of the 911

17   callers, does it, sir?

18   A.  I would have to reference the -- in my affidavit and my

19   ROI, no, it does not.

20   Q.  Okay.  So would you agree that you testified here today

21   that it was reported that gun shots were in the back yard?

22   A.  I believe I said that.

23   Q.  But that's not what you said in the affidavit and that's

24   not reflected in your report, correct?

25   A.  Correct.

1    Q.  Would you also agree that in your report, you stated

2    that it was unknown whether or not the vehicle, that being

3    the maroon vehicle that was parked in an alley at 10 o'clock

4    in the morning was -- had any involvement in the alleged

5    shooting; correct?

6    A.  Yes, I stated that.

7    Q.  And the reason you stated that was because based upon

8    your investigation, based upon your review of all of the St.

9    Paul Police Department reports and your conversations with

10   the officers, there was no direct evidence or information to

11   suggest or that anyone in the maroon vehicle was involved in

12   the shooting; correct?

13   A.  Besides the 911 caller's reference to it, no.

14   Q.  Well, the 911 call you wrote in your affidavit states

15   it's unknown whether or not the vehicle was involved in any

16   shooting, correct?

17   A.  Correct, but the 911 caller referenced the vehicle, yes,

18   sir.

19   Q.  Referenced that the vehicle, there was a vehicle simply

20   in the alley at 10 o'clock in the morning and he or she had

21   no idea or didn't have any information as to whether it was

22   involved in the alleged shooting, correct?

23   A.  Correct.

24   Q.  Now according to your affidavit, when St. Paul police

25   officers approached the maroon Tahoe, the driver of the

1    Tahoe it states got out of the vehicle; correct?

2    A.  Correct.

3    Q.  It states that he looked around and made furtive

4    movements, correct?

5    A.  Yes, sir.

6    Q.  Okay.  Now it doesn't say -- and, again, that's taken

7    almost verbatim, if not verbatim directly from your report,

8    correct?

9    A.  Correct.

10   Q.  And your report again is based upon your review of all

11   of the police reports, as well as all of your conversations

12   with the investigating officers at the St. Paul Police

13   Department, correct?

14              MS. BRENNAN:  Objection, asked and answered.

15              THE COURT:  Overruled.

16   BY MR. BEHRENBRINKER:

17   Q.  Now, when your lawyer was asking you questions, you went

18   on quite a bit about how the driver, excuse me, how the

19   driver got out but was not following commands, and he was

20   digging inside the passenger side of the vehicle, do you

21   recall that testimony, sir?

22   A.  I do.

23   Q.  Now, nowhere in your report and nowhere in your

24   affidavit do you mention that when the man got out of the

25   vehicle he was not following commands, correct?

1    A.  What was that, I'm sorry?

2    Q.  Nowhere in your report or your affidavit do you mention

3    or state that when the man got out of the SUV, he refused to

4    follow commands, correct?

5    A.  Correct.

6    Q.  And nowhere in your affidavit or your report based upon,

7    again, based upon your review of the entire St. Paul

8    investigation does it reference that the man who got out of

9    the car was digging into the passenger side of the vehicle,

10   correct?

11   A.  Correct.

12   Q.  Okay.  Now, would you also agree that that's different,

13   your testimony here today is different from what your

14   affidavit suggests or states, would you agree with that?

15   A.  Sir, I would say that my testimony was more

16   comprehensive.  The affidavit was set forth not to be

17   exhaustive but to include enough probable cause, sir.

18   Q.  Well, okay.  You basically stated he made "furtive

19   movements."

20   A.  Yes, sir.

21   Q.  Can you define for me what you mean or what you mean by

22   "furtive movements?"

23   A.  Yes, sir.  It, from how I understand it and how I

24   believe it is defined as more secretive motions as to an

25   attempt to flee.

1    Q.  Okay.  That's pretty general and somewhat vague.  Can

2    you be a little bit more specific?  What is it, what in

3    particular that this man did when he got out of the car and

4    was standing by the car pursuant to the command of the St.

5    Paul Police Department would be a furtive movement?

6    A.  Per the reports, I read, sir, they referenced his

7    shiftiness, looking around, looking in different directions,

8    not looking in the direction of the police officers.

9    Q.  Shiftiness?  What did he do that would be shifty?

10   A.  Again, sir, I was not at this incident.  Just per the

11   reports was his body language and, like I said, sir, I'm not

12   sure how else you want me to define it as to simply looking

13   around.

14   Q.  Okay.  Well, you're the one, you used "furtive

15   movements" as your term of art in order to establish

16   probable cause in your affidavit, did you not?

17   A.  I did.

18   Q.  All right.

19        MS. BRENNAN:  Your Honor, I'd like to object at

20   this point, and renew my objection based upon to the extent

21   that Mr. Behrenbrinker is inquiring of the witness in order

22   to challenge based on Fourth Amendment grounds, it's not

23   appropriate in this proceeding.  And if you look at Rule 5.1

24   of the Rules of Criminal Procedure on preliminary hearings,

25   it specifically states in 5.1E that at the preliminary

1    hearing, the defendant may cross examine adverse witnesses

2    and may introduce evidence but may not object to evidence on

3    the ground that it was unlawfully acquired.  It explicitly

4    says we're not going into Fourth Amendment search and

5    seizure at the preliminary hearing.  The purpose of the

6    hearing is to determine whether there's probable cause to

7    believe that the defendant had that gun.

8              THE COURT:  Mr. Behrenbrinker?

9              MR. BEHRENBRINKER:  This is probable cause

10   hearing, Your Honor.  That's the whole purpose of the

11   preliminary hearing is to determine whether or not there is

12   probable cause.  In this instance, we have the government's

13   witness who is their case agent who was sent here to testify

14   to establish, to justify the stop.  That's his whole

15   function.  That's why he's here today.  It's the

16   government's burden to show that there was reasonable

17   suspicion in order to make a Terry stop and a Terry

18   pat-down.

19             Now, I have a right to examine this witness

20   concerning what articulable facts, what about, what is it

21   about the totality of the circumstances, which would give an

22   objective person a reasonable suspicion to believe that the

23   driver was either engaged in criminal activity or was about

24   to engage in criminal activity.  That's what the Supreme

25   Court said in *Terry*.

1          Moreover, in this particular case, in his

2     affidavit, he states because of furtive movements, they

3     quickly detained Hanes.  They quickly seized him based on

4     furtive movements, then they did a pat-down.  That's a

5     search in Ohio or *Terry v. Ohio*.

6          And what -- this special agent has not testified,

7     the government hasn't produced any evidence to suggest that

8     there was a reasonable person would fear for their own

9     personal safety to do a safety -- number one, to seize him

10    and then to do a safety pat-down search.  All required by

11    *Terry v. Ohio*.  This is the appropriate venue to raise these

12    issues.  I'll stop there.

13          THE COURT:  I will overrule the objection.  We

14    need to make some progress here though.  It seems like we're

15    spinning our wheels.

16    BY MR. BEHRENBRINKER:

17    Q.  Can you -- all right.  Special Agent, referring you to

18    paragraph 5 of your affidavit, sir.

19    A.  Yes, sir.

20    Q.  "Officers quickly detained Hanes and pat-down searched

21    him for weapons."  Are you aware of any, or strike that --

22    would you agree in your affidavit, you do not make any

23    statement concerning whether or not the officers had any

24    fear for their personal safety at that time?

25    A.  Referencing my affidavit, I do not make that statement.

1    Q.  Okay.  Your report that you used to prepare your

2    affidavit, again, based upon your review of the entire St.

3    Paul Police Department file, does not make any reference to

4    any facts to support the notion that the officers had a

5    reasonable fear for their safety at the time they seized him

6    and did the search, correct?

7    A.  Correct.

8    Q.  And as far as -- strike that.

9            Why did you use the term "furtive movements?"

10   What did you --

11           MS. BRENNAN:  Objection, asked and answered.

12           THE COURT:  Sustained.

13           MR. BEHRENBRINKER:  Okay.  I don't have any

14   further questions at this time, Your Honor.

15           THE COURT:  Does the government have any further

16   witnesses in regards to probable cause?

17           MS. BRENNAN:  I don't, Your Honor.

18           THE COURT:  With regard to detention, does the

19   government are they continuing their motion for detention?

20           MS. BRENNAN:  Yes, we are.

21           THE COURT:  And you indicated that you'll be

22   presenting your argument or presenting your position for

23   detention on argument versus additional witnesses?

24           MS. BRENNAN:  Yes, Your Honor.

25           THE COURT:  Okay.  Mr. Behrenbrinker, do you have

1        any witnesses in regard to the detention?

2                   MR. BEHRENBRINKER:  No, I don't, Your Honor.

3                   THE COURT:  Okay.  Go ahead, Mr. Behrenbrinker.

4                   MR. BEHRENBRINKER:  I would like to be heard on

5        the issue of detention, however, Your Honor.  And if it

6        pleases the Court, I would like to be heard briefly if we're

7        finished with witnesses in connection with the preliminary,

8        I would briefly like to argue our position.

9                   THE COURT:  Prior to the issue of detention, you

10       would like to have a brief argument in regard to probable

11       cause?

12                  MR. BEHRENBRINKER:  Yes, sir.

13                  THE COURT:  That's fine.  That's fine.

14                  Ms. Brennan, I'll let you go first as far as the

15       issue of probable cause.

16                  MS. BRENNAN:  Okay, thank you.

17                  Your Honor, I do have a quick question on redirect

18       of the special agent?

19                  THE COURT:  I'm sorry.  I'm going to have to back

20       up.  You have a right to redirect, and I should have allowed

21       you to have that, and I'll let you proceed with that at this

22       point, if you'd like.

23                  MS. BRENNAN:  Thank you, Your Honor.  I'm just

24       going to keep this really brief.

25

1             **REDIRECT EXAMINATION**

2    BY MS. BRENNAN:

3    Q.  First of all, Special Agent Hoisington,

4    Mr. Behrenbrinker referred to me as your lawyer.  Am I your

5    lawyer?

6    A.  No, ma'am, you are not.

7    Q.  Okay.  You understand I represent the United States,

8    right?

9    A.  That is correct.

10   Q.  Okay.  When you prepare your report that you submitted

11   to my office in connection with this case, what is the

12   purpose of that opening ROI that you prepare for us?

13   A.  Ma'am, it is primarily -- I mean the purpose of it is to

14   primarily to present to you a summary of the facts from

15   these cases.

16   Q.  Okay.  So in addition to submitting this summary that

17   you prepare to us, do you also provide my office with all of

18   the underlying reports that are the actual reports from the

19   incidents?

20   A.  I do, yes.

21   Q.  Okay.  And are there things that are listed in the

22   underlying reports that aren't always in your summary?

23   A.  Absolutely.

24             MS. BRENNAN:  Okay, no further questions.

25             THE COURT:  Recross?

```
 1              MR. BEHRENBRINKER:  Just briefly.
 2                      RECROSS EXAMINATION
 3    BY MR. BEHRENBRINKER:
 4    Q.  The affidavit that you prepare in support of the
 5    Complaint, you prepared that based on your review of your
 6    report as well as all of the other investigation materials
 7    that you had available; correct?
 8    A.  Correct.
 9    Q.  And the purpose --
10              MR. BEHRENBRINKER:  And that's all I have, thank
11    you.
12              THE COURT:  Ms. Brennan, anything further?
13              MS. BRENNAN:  No, Your Honor, thank you.
14              THE COURT:  Then I'll allow you a brief or I
15    shouldn't say a "brief," I'll allow you an argument in
16    regards to probable cause at this point.
17              MS. BRENNAN:  Okay.  Thank you, Your Honor.
18    Before I make my argument, I'd like to just ask the Court
19    what its intention is on this Fourth Amendment issue that
20    Mr. Behrenbrinker intends to argue, and what I would request
21    and urge the Court is not make a finding on that.
22              I think that that is an issue that is going to be
23    litigated at the next stage of these proceedings in
24    connection with pretrial motions.  It is typically the
25    searches and the stops in a case like this.  The government
```

1    would bring in the witnesses who were present for the stop

2    and the search and, you know, fully develop the record on

3    that so that the Court can make a, you know, an informed

4    finding.

5              And, again, Rule 5.1E indicates that that is not

6    what is supposed to happen at this juncture, and so I would

7    urge the Court to refrain from addressing that and to

8    instead focus on whether there is evidence establishing

9    probable cause that Mr. Hanes.

10             THE COURT:  My job today is to determine probable

11   cause whether or not this can be sent over, and I will also

12   make a determination as to detention, so that's where I'm at

13   with this.

14             MS. BRENNAN:  Thank you.

15             THE COURT:  I'm not expanding it beyond what I

16   should be expanding it to.

17             MS. BRENNAN:  Thank you, Your Honor.  With respect

18   to probable cause, the evidence shows there was a report of

19   a gun shot, unclear whether this vehicle may or may not have

20   been involved in it, but officers arrived on scene.

21   Mr. Hanes is there in a vehicle, and when he is removed from

22   the vehicle, he tries to flee from officers and then

23   officers find inside the vehicle a gun, and the gun has

24   essentially has his DNA on it.  His DNA cannot -- he cannot

25   be excluded from being a contributor to the DNA that was

1    found in two places on that gun.  In one place, 98.8 percent

2    of the population can be excluded.  In another place on the

3    gun, 96 percent of the population can be excluded.

4            Given all of the circumstances here, there is

5    probable cause that on December 4th of 2020, Mr. Hanes

6    possessed a firearm.  And also the evidence shows that

7    Mr. Hanes is a prohibited person, that he's been previously

8    convicted of felonies.  The Court can see that from the bond

9    report as well, and Mr. Hanes was aware that he had been

10   convicted of felonies because he had actually served prison

11   sentences of longer than one year.

12           And, finally, the evidence shows that there is

13   probable cause to believe that the firearm travelled in

14   interstate commerce and, therefore, the interstate nexus has

15   been established.

16           THE COURT:  Thank you.  Mr. Behrenbrinker?

17           MR. BEHRENBRINKER:  Thank you, Your Honor.

18           The threshold question that really the Court needs

19   to address in terms of this probable cause hearing today

20   relating to Count I of the Complaint is whether the specific

21   facts that led to the Terry stop would lead an objective

22   person to form a reasonable suspicion that Mr. Hanes was

23   engaged in criminal activity.

24           The general rule, as the Court is well aware, and

25   I'm sure counsel for the United States is as well, under the

1      Fourth Amendment, an officer may not generally under the

2      Fourth Amendment may not seize a person.  An officer may not

3      seize a person without a warrant, I should say, unless

4      there's an exception to the warrant.  Those exceptions are

5      narrowly drawn exceptions.

6              One exception is the Terry investigative stop.

7      But the question is under *Terry v. Ohio* exception, an

8      officer must have reasonable suspicion that that person is

9      about to or is engaged in criminal activity.  An officer may

10     also briefly frisk a person if that person -- if that

11     officer, excuse me, has reasonable safety concerns to

12     justify a protective frisk.  Officers must have reasonable

13     suspicion based on specific and articulable facts known to

14     the officers at the time at the inception of the stop, not

15     later, not after the events that most of the issues that the

16     government wants to talk about.  It's what the officers knew

17     at the inception of the stop.

18             What, you know, in this particular case, this

19     special agent prepared the affidavit.  All he could put in

20     his affidavit, he's trained, he knows how to prepare an

21     affidavit, how to establish probable cause.  He testified

22     what he reviewed.  He testified who he talked to.  He's the

23     case agent on the case.  He's the person who is supposed to

24     be and is most knowledgeable concerning the underlying facts

25     and background of this case.

1              He used the term "furtive movements."  "Furtive

2      movements," Your Honor, is a catch phrase.  It's a vague

3      term.  It's vague, and it's generalized.  And standing

4      alone, I submit that "furtive movement" is so vague, so

5      generalized, it's unreliable.

6              He testified here today different.  It's not in

7      his report what he testified.  He admitted that.  In his

8      report he testified was based upon all of his review of the

9      entire St. Paul Police Department file as well as followup

10     conversations with officers that he had particular input,

11     from that he made an affidavit.

12             There's no detailed description as to what it is

13     that this man did to give the officers a reasonable

14     suspicion that he was either involved in criminal activity

15     or about to engage in criminal activity.  The witness here

16     today could not state one fact.  He was not aware of one

17     fact which would give a reasonable officer, an objective

18     officer, a reason to believe that his personal safety was in

19     danger for him to make a seizure and a protective patdown

20     search.  Not one fact.

21             On those grounds, based upon the affidavit, based

22     upon the testimony, based upon the law, Count I should not

23     go forward.  The government has not met its burden.  The

24     stop was not constitutional.  It was illegal.  The

25     protective pat-down search was not legal, and for that

1    reason, Count I should be dismissed.  Thank you, Your Honor.

2           THE COURT:  Thank you.

3           Ms. Brennan, in regards to detention?

4           MS. BRENNAN:  Your Honor, I'm going to argue

5    primarily from the bond report, but even before I get to the

6    bond report, if you just look at the two counts alleged in

7    the affidavit, the circumstances surrounding Mr. Hanes'

8    arrest on December 4th and then again the circumstances

9    surrounding his arrest on March 22 of 2021.  In both cases,

10   he attempted to flee from police.

11          In the first case, on December 4th, he runs away

12   from the police, breaks free as they're leading him to the

13   squad car, he runs away.  He tries to get in a nearby

14   residence.

15          On March 22 of 2021, he's being surrounded by a

16   marked squad car trying to effectuate a traffic stop before

17   he gets onto the freeway, and he rams into one of the squad

18   cars and then continues to disobey their commands for a

19   period of time before he finally exits the vehicle and can

20   be apprehended.

21          If you look through the bond report, there are

22   numerous instances of motor vehicle fleeing.  He's been

23   charged numerous times with fleeing police in a motor

24   vehicle.  He's been convicted at least twice, I believe, of

25   motor vehicle fleeing in 2017.  In 2018, he was convicted of

1    motor vehicle fleeing.

2            He's got one pending case, actually, he's got two

3    pending cases of motor vehicle fleeing that we haven't even

4    talked about.  He's got one pending from November 19th of

5    2020, and another case pending from February 7th of 2021.

6    Both of those are motor vehicle fleeing police.

7            He's got convictions for crimes of violence.  He's

8    got convictions for controlled substances.  One crime of

9    violence, I should be clear.  He was convicted of second

10   degree aggravated assault in 2011.

11           In 2007, he was convicted for aiding an offender

12   after the fact.  The underlying case there was a homicide

13   case.  He's got multiple failures to appear on multiple

14   cases throughout the years as demonstrated in the bond

15   report.

16           I did -- I tried to go through the bond reports

17   pretty carefully because I know that sometimes a defendant

18   will get a failure to appear when they're in custody in

19   another jurisdiction, even if you take a couple of those out

20   of the bond report, he has multiple failures to appear in

21   those cases.

22           So, Your Honor, and if we just even look at the

23   charges that Mr. Hanes has pending right now, he's got five

24   pending felony cases since November of 2020.  So that's the

25   last six months alone.  He's got a pending November 11,

1   2020, pending felony ammunition.  November 19th, motor

2   vehicle fleeing.  December 4th, same as what's listed in our

3   Complaint at Count I.  February 7th, receiving stolen

4   property and fleeing in a nonmotor vehicle fleeing.

5            And in that case, February 7th, by the way, it was

6   Mr. Hanes' is alleged to have jumped in a car that was being

7   driven by a female acquaintance and telling her to take off,

8   so it was motor vehicle fleeing, but he was a passenger.

9            He's got the March 22 case pending also in State

10  Court.  And he's got -- I'm sorry, that's March 22nd, he's

11  not charged in State Court, but he's obviously charged here.

12  That was just a PC arrest.  And then on April 16th, which

13  was after that and just about one month ago, he has a

14  pending second degree assault with a dangerous weapon,

15  threats of violence, and first degree damage to property,

16  risk of bodily harm.  And in that April 16th case, he is

17  alleged to have assaulted an ex-girlfriend or a current

18  girlfriend or acquaintance and then attempted to run her off

19  the road using his vehicle ramming into her vehicle when she

20  was trying to go to the doctor and seek medical attention.

21  Those are the allegations in that Complaint.

22            Your Honor, I think it's clear that Mr. Hanes,

23  there are no condition or combination of conditions that

24  would assure the safety of the community and the defendant's

25  reappearance in these court proceedings if he is released.

1            Also, on the drug count, on Count II of the March

2     22, 2021 incident, there is a presumption in favor of

3     detention based on that, the allegations in that count,

4     which is five year mandatory minimum, 20-year stat max on a

5     methamphetamine charge.

6            So, Your Honor, based on the record as a whole, we

7     would respectfully ask the Court to detain Mr. Hanes pending

8     trial, pending further proceedings.

9            Your Honor, you're muted.

10           THE COURT:  I'm sorry, I had some outside noise on

11    the other side of my door here so I had to mute myself.

12           Thank you, Ms. Brennan.  Mr. Behrenbrinker?

13           MR. BEHRENBRINKER:  Thank you, Your Honor.  We

14    have had an opportunity to review the pretrial services

15    report, and we don't have any disagreement that Mr. Hanes

16    has a very significant prior criminal history.  He has been

17    convicted, I believe, at least seven times for felonious

18    type offenses.  He has been to prison.  He has been to jail

19    lots of times.  He has committed lots of driving, lots of

20    other types -- driving offenses, driving after revocation,

21    so on, and so on, but he has serious felonious type

22    offenses.

23           We don't dispute that.  And we don't dispute that

24    the charges that he's facing here are very serious.  We've

25    discussed that.  My point is, Your Honor, is that given -- I

1    don't know if the Court is aware of, I think the government

2    is but I'm not sure that the Court is, the physical

3    condition that Mr. Hanes is in right now.

4           In I believe it was the third week of April or the

5    middle part of April, he was coming out of a restaurant on

6    the east side of St. Paul called Magnolia's, his adult

7    sister is a waitress, that's not the right word, she works

8    there, and he was shot, a drive-by shooting, was shot four

9    times.  He was taken by ambulance to Regions Hospital.  He

10   underwent nine hours of orthopedic surgery.  He was shot in

11   his lower left leg twice.  He was shot in his right hip

12   once.  He was shot in his right arm once.  He has plates and

13   rods and screws holding his bones together.

14          After a nine hour surgery, he was hospitalized

15   for, I believe, 10 days, approximately.  I may be mistaken

16   on that.  And he needs to go through -- needs physical

17   therapy.  He was on oxycodone for pain 21 days.  That

18   prescription ran out and won't be renewed because of the

19   dangers associated with addiction of that very severe but

20   effective pain killer.

21          He's in a wheelchair now.  When he was initially

22   released from Regions Hospital, he was taken to the Ramsey

23   County Jail for an outstanding arrest warrant.  The Ramsey

24   County Jail looked at him, evaluated him, decided jail was

25   not the right place for him because we can't take care of

1     him.  We can't provide him with what he needs as far as

2     reasonable, necessary medical care and treatment.

3              He needs to have a high protein diet because of

4     his broken shattered bones that are now held together,

5     literally, with plates, rods and screws.  He needs physical

6     therapy.

7              Presently, his, which he could not get at the

8     Ramsey County Jail, so what was their response to his

9     dietary, physical therapy and medical needs, was they moved

10    him to the Ramsey County workhouse.  Why?  Because they

11    could give him what they could get him.  They could provide

12    him what he needs, reasonable and necessary dietary and

13    medical care and treatment including physical therapy.

14             It's my understanding that the physical therapist

15    services came out from Regions to the Ramsey County

16    Workhouse in order to give him and provide him with the care

17    and treatment that he needs in order to recover from his

18    injuries.

19             He's still in a wheelchair.  He's not given any

20    type of a special diet, not getting physical therapy.  He's

21    not getting assistance.  He's got one arm that he -- I

22    believe it's his left arm that he can use.  He's in a cell

23    to use the toilet.  He has one arm.  He has a cast on his

24    right leg.  He's got bandage and so on.

25             THE COURT:  Mr. Behrenbrinker, we need to stop for

1    just a second.  Your client is waving his hands here.  Could

2    you unmute him for a second there, Mr. Hanes?

3                MR. BEHRENBRINKER:  I think the court reporter --

4                THE CLERK:  It looks like it lets me mute, but it

5    doesn't let me unmute.  He might have to ask someone at the

6    jail.

7                MR. BEHRENBRINKER:  Oh, boy, good luck with that.

8                THE COURT:  Okay, Mr. Hanes?

9                THE DEFENDANT:  Yes, Your Honor.

10               THE COURT:  Okay, you were waving your hands, was

11   there something you needed to bring to our attention?

12               THE DEFENDANT:  Yes, it's about my right leg, Your

13   Honor.  It's my left leg that's in the cast right now.  It's

14   my right leg that's got plates in it and rods and stuff in

15   it, but it's my left leg that has a cast, Mr. James.  I just

16   wanted to make sure you got it right.

17               MR. BEHRENBRINKER:  Okay, sorry.

18               THE DEFENDANT:  That's all right.

19               MR. BEHRENBRINKER:  So you have rods in your left

20   leg and a cast on your right leg?

21               THE DEFENDANT:  No, I have a cast on my left leg

22   and I got rods in my right leg.

23               MR. BEHRENBRINKER:  Okay, sorry.  Why is there a

24   cast on your left leg?

25               THE DEFENDANT:  Because I've been shot two times,

1    sir.  I've been shot two times in my left leg, and I can't

2    put no pressure on my left leg.

3              MR. BEHRENBRINKER:  I got it.  I understand.

4              THE DEFENDANT:  Okay.

5              MR. BEHRENBRINKER:  Okay.  So basically both legs,

6    Your Honor, are disabled right now from the shooting.  So he

7    basically has one good arm and that one good arm, he has to,

8    and it's not his prominent arm, it's his left arm that he

9    has to try to get himself from his wheelchair to the toilet.

10   And this past Sunday he hadn't had a shower since arriving

11   at Sherburne.  That was the government's response, you know,

12   they pick him up at the Ramsey County Courthouse or the

13   Ramsey County Workhouse and get him shipped out to Sherburne

14   County, where I spoke to Commander Carr last evening, and he

15   confirmed that to date they haven't provided any, the

16   Marshal's service and the United States government hasn't

17   done anything to ensure that he gets physical therapy, gets

18   proper medical care.  It's building up to almost a

19   deliberate indifference toward his clear medical needs to

20   just ignore him.

21             We agree, we're not disputing, I'm not disputing

22   any of the laundry list, the litany of offenses that the

23   government has set forth.  We're just saying, as far as this

24   detention hearing is concerned, Your Honor, Sherburne County

25   Jail isn't the right place for him given his more than

1   significant, severe physical limitations.  He needs to have

2   these dietary physical therapy.  Which is it your left or

3   right arm that is numb from your --

4            THE COURT:  Mr. Behrenbrinker, do you want to call

5   your client as a witness or are you preparing an argument?

6            MR. BEHRENBRINKER:  Well, I can put him on.

7            THE COURT:  Would you like to call your client as

8   a witness?

9            MR. BEHRENBRINKER:  Yes, Your Honor, I will.

10           THE COURT:  Mr. Hanes, would you raise your right

11  hand, please?

12           THE DEFENDANT:  Yes, Your Honor.

13                          **JOSHUA HANES,**

14           After having been duly sworn, testified as

15  follows:

16           THE COURT:  Go ahead, Mr. Behrenbrinker.

17           MR. BEHRENBRINKER:  Okay, thank you, Your Honor.

18                      **DIRECT EXAMINATION**

19  BY MR. BEHRENBRINKER:

20  Q.  Mr. Hanes, around the middle part of April or

21  thereabouts, you were shot as you were leaving or entering

22  the Magnolia Restaurant in St. Paul; is that correct?

23  A.  Mr. James, I didn't get to even answer the main question

24  yet, sir, but I was going there to get my food, yes, I was,

25  sir.

1     Q.  And is that where your sister works?

2     A.  Yes, that's where my sister works.

3     Q.  What's her name?

4     A.  Ashley Hanes.

5     Q.  Ashley?

6     A.  Yes.

7     Q.  Okay, now Ashley --

8     A.  Sir, I'm sorry, but just the thought of me getting shot

9     because it hurts my head, and it hurts me so much.  It was

10    traumatic.  It was traumatic to my head because all that

11    thinking about getting shot, man, I'm just glad to be alive

12    today, but every time I think about it, it kind of hurts me.

13    I'm sorry for crying and stuff but that's just me keep

14    going.  I just want to let you guys know don't mind my

15    tears.

16    Q.  Well, I advised the Court based on our conversation that

17    you had been shot four times, is that true?

18    A.  Yes, yes, yes, James.

19    Q.  And you were shot two times in the left leg; is that

20    correct?

21    A.  Yes, in my lower left shin, yes, it is.

22    Q.  And were the bones shattered?

23    A.  They were shattered, man.  I remember looking down at

24    them, James, and I remember seeing my bone sticking out of

25    my skin.

Sandoval - Cross Examination

```
1    Q.  Okay.  And in your left leg, were you also shot in the

2    right hip?

3    A.  Yes, yes, sir.  I was shot --

4    Q.  One time in the hip?

5    A.  One time in the hip, went through my hip, shattered my

6    hip and came out my butt.

7    Q.  And then you were also shot in your right arm, is that

8    correct?

9    A.  Yes, sir, right here.  I don't know if you guys can see

10   it or not, man.  That's where my plate went in, but that's

11   where the exit wound is, and this is where the entry wound

12   is.

13   Q.  Okay.  Now, based upon that being shot, was this a

14   drive-by shooting?

15   A.  Yes, sir.

16   Q.  Did you have any idea or do you know who it was that

17   shot you?

18   A.  I have no idea who it was, sir, I just remembering

19   seeing someone --

20   Q.  Were you involved in any type of altercation or an

21   incident with these people beforehand?

22   A.  No, sir.  No, sir.

23   Q.  Okay.  Were you taken by ambulance to Regions Hospital?

24   A.  Yes, I was.

25   Q.  Did you undergo orthopedic surgery there?
```

1    A.  For nine hours.

2    Q.  Okay.

3    A.  For nine long hours and the doctor said he was surprised

4    that I even came through with the way they fixed me up.

5    Man, I'm blessed that they fixed me up, you know, to where I

6    still have my limbs.

7    Q.  Do you have orthopedic metal plates, rods and screws in

8    your left leg?

9    A.  Everywhere I got shot, sir, is where I got plates, shots

10   or screws.  I got rods and a plate in my left shin.  I got a

11   rod in my right hip, and I got a plate in my right arm,

12   sir.  I'm pretty sure that's what it is, but I'm not

13   positive, so don't quote me on that.  You guys that look at

14   my medical forms and stuff.

15   Q.  Okay.  When did you arrive at Sherburne County, do you

16   know?

17   A.  Sometime, what was it, Friday morning, Friday afternoon

18   I should say.  Yeah, Friday afternoon.

19   Q.  Immediately after your initial appearance?

20   A.  Yes, sir.

21   Q.  Okay.  And had you been at the Ramsey County Workhouse

22   before that?

23   A.  Yes, sir.

24   Q.  How long had you been at the Ramsey County Workhouse?

25   A.  I was at the Ramsey County Workhouse for probably less

```
1    than a week.

2    Q.  Did you go directly essentially from Regions Hospital to

3    the Ramsey County Workhouse?

4    A.  Yes, sir.

5    Q.  Was there a brief stay at the Ramsey County Jail first?

6    A.  No, sir.  They seen me, and they said we can't house me

7    because of my conditions.

8    Q.  Okay.  Are you in a wheelchair because the doctors at

9    Regions put you in a wheelchair?

10   A.  Yes, sir, they wanted me in a wheelchair because they

11   don't want me to -- I can't put no pressure.  I got heel to

12   toe no pressure on my left foot, where basically I only got

13   one leg right now, but I really don't want to have one leg

14   because it's hard for me to lift that leg up, man.  This is

15   crucial.

16   Q.  Do you have a cast on your leg?

17   A.  Yes, I got a cast on my leg right now, sir.

18   Q.  And is that on your?

19   A.  My left leg.

20   Q.  Left leg?

21   A.  Yeah.

22   Q.  Now at Sherburne, are you still locked down 23 hours a

23   day?

24   A.  Yes, sir, man, crucially 23 hours a day, man, this is

25   hell over here, man.  I can't even, I can't get out of bed.
```

1    Q.  Are you in lock down because of the pandemic protocol --

2    A.  Yes, sir.

3    Q.  -- because you were just brought in?

4    A.  Yep, yes, sir.  I can't do nothing about that.

5              COURT REPORTER:  I'm sorry, just one at a time,

6    please.

7              THE DEFENDANT:  I'm sorry, Ms. Weinbeck.

8    BY MR. BEHRENBRINKER:

9    Q.  Is your doctor, your orthopedic surgeon at Regions, has

10   he ordered that you received physical therapy?

11   A.  Yes, sir.

12   Q.  Are you receiving physical therapy?

13   A.  No, sir.

14   Q.  Were you receiving physical therapy at the Ramsey County

15   Workhouse?

16   A.  Yes, sir.

17   Q.  How are you getting it?  Who is providing it?

18   A.  I'm not sure, I forgot what his name was, but I met him,

19   I met him it was that Thursday before I came here, and I met

20   him that day, and he's supposed to come meet me yesterday

21   back there, but I ended up coming over here and stuff.  I

22   can't remember what his name is.  It's hard for me to

23   remember names, sir.

24   Q.  Was he through the workhouse or was he through Health

25   Partners Group Health or HealthPartners Regions?

1   A.  I want to say it was through both of them, but he does

2   DOC, so it has to be through the jail or something.

3   Q.  Okay.  How often do you need to see a physical

4   therapist?

5   A.  A couple times, when I was in the Regions Hospital, I

6   was seeing a physical therapist every day.  They come in,

7   they get me up, stretch me out, get me up to show me how to

8   walk and do the things I need to do like get on a sliding

9   board, how to get out of bed, how to sit in my wheelchair,

10  you know.

11         They get me in my shower.  They helped me with my

12  showers and because my showers I needed the help because I

13  can't, I can't -- this is my hand, my right hand right here.

14  I can't feel nothing from here to here.  You know, I don't

15  know what --

16  Q.  Are you supposed to get hand physical therapy or hand

17  therapy as well?

18  A.  Yeah, because I'm supposed to have my little ball, they

19  said the physical therapist gave me a ball to squeeze

20  because, you know, I can barely pick this -- look, I can

21  pinch this to pick this up.  (Witness indicates).

22  Q.  Did anybody tell you that the numbness or the weakness

23  is because of nerve damage resulted from either getting shot

24  or the invasive surgery that you underwent?

25  A.  Yes, sir.

1    Q.  Okay.  And will that come back do you know, or is it if

2    you have the physical therapy that you need?

3    A.  It's just kind of got to take it day by day, sir, to see

4    if it ever come back, and I can't feel nothing in my hand

5    right now.  Actually, it's all the way to these two fingers,

6    I can't feel nothing.  See, this is the farthest I can open

7    my hand.  This is as much as I can squeeze.  I can't squeeze

8    nothing.  (Witness indicates)

9    Q.  So besides your physical needs, did your doctors at

10   Regions, did they tell you anything about the type of diet

11   you should have given the nature of your injuries and

12   recovery and so on?

13   A.  Yes, sir.  When I was at Regions Hospital, they had me

14   on a high protein diet, so every time I had my meal they had

15   me on a certain kind of milk that had a lot of protein in

16   it.  It had like 30 grams of protein, and then in between

17   meals they give me two milks, two milks to drink, so I get

18   six milks a day and then I get a snack at night, you know,

19   with my meds and everything because I was on a lot of meds,

20   and I still am on a lot of meds at the same time, sir.

21   Q.  Okay.  What are you taking now?  What do you get for

22   pain at Sherburne?

23   A.  Man, Tylenol.  Tylenol.  They're giving me Tylenol for

24   these pains.  They said they got me on four different kind

25   of pain meds, which is like Gabapentin, the Tylenol, and I

1    can't remember what the other two are, but they took me off

2    four other ones I should be on right now.

3    Q.  Where are you talking about?  Who took you off?

4    A.  Sherburne County did because they said that the ones

5    that I have are the ones that they're just too potent or

6    something, sir, but they give me my oxys but they won't give

7    me my Flexerils.

8          You know, I think oxycontin, the oxycodone or

9    whatever they are, I think they're more potent than the

10   Flexeril because the Flexeril, they help my muscles, they

11   help relax my muscles.

12   Q.  I thought you were off the oxy now?  I thought your

13   prescription --

14   A.  Yes, I am off the oxy now.  Yes, I am, sir.  I've been

15   off the oxy now for about three or four days.

16   Q.  Okay.  You used to be on Flexeril though, is that right?

17   A.  Yes, sir.

18   Q.  Flexeril is the muscle relaxant to help you sleep?

19   A.  Yes, sir.

20   Q.  They're not giving that to you?

21   A.  No, they're not.  No, sir.

22   Q.  And the reason they said it's too powerful or something?

23   They don't have that in the institution or what?

24   A.  I don't know, they took it away because they say it's a

25   high, it's a high medication or something like that.  I

Sandoz - Cross Examination

1    can't, I can't remember the words that they used, but I

2    talked to the nurse earlier today.  She said that it's kind,

3    it's kind of rare that they give people Flexeril because

4    it's a highly medication.

5    Q.  What else, is there anything else you're supposed to be

6    taking?

7    A.  I'm supposed to be taking like my psych meds that keep

8    me calm, you know, because like I try not to think about.

9    Q.  Yeah, are you getting those?

10   A.  I don't think I am, sir.  I'm not getting my sleeping

11   meds either.  They took my sleeping meds away from me, too,

12   so I'm not getting no sleep in here at all.  It's hard for

13   me to sleep in here because I got so much pain.  I wake up

14   in the middle of the night, you know, and I be needing my

15   pain meds in the middle of the night like I used to be

16   getting them.

17   Q.  Right.  Do you get any help for taking showers?

18   A.  Man, Mr. James, they gave me one shower since I've been

19   here.  You want to know what they did?  They gave me a bag,

20   right, they gave me a bag, they told me to go take a shower.

21   I said, "Hey, I need a wrap.  We got to wrap this up so my

22   cast don't get wet."

23          You want to know what kind of tape they came back

24   with, Mr. James and Your Honor?  They came back with Scotch

25   tape.  Man, they came back with two pieces of Scotch tape

1    this long, and, man, they told me to stick my foot outside

2    of the shower curtain and expect me not to get that wet.  So

3    as I'm taking a shower and I get out, man, I take that off.

4    It got moist, right, my cast got moist.

5         Well, later on in the day all of a sudden my cast

6    is coming off, and I feel like my whole ankle is swelling

7    in, so my cast comes off.  And I showed you the other day,

8    James, what my cast looked like the other day.  Man, my cast

9    looked like hell.  It looked like hell, man.  I didn't get

10   no medical attention until today, earlier today, they

11   finally put a little ace bandage to wrap it up again, man,

12   and I don't know what's going on man, but that's as much

13   medical attention they gave me.

14        You know, every time I send a kite to them about

15   something, man, they send me a letter back or something

16   saying that it's basically it declined, declined, declined.

17   You know, all I'm asking is I just want to get the medical

18   attention so I can heal right.

19   Q.  Okay.  You mentioned your sister works at --

20   A.  Magnolia's.

21   Q.  What's her name again?

22   A.  Ashley Hanes.

23   Q.  Who old is Ashley?

24   A.  She's 31.

25   Q.  31.  Okay.

1          MR. BEHRENBRINKER:  I don't have any further

2     questions, Your Honor.

3          THE COURT:  Ms. Brennan?

4          MS. BRENNAN:  No questions, Your Honor.

5          MR. BEHRENBRINKER:  Your Honor, the only other

6     thing I would say on behalf of Mr. Hanes is that Ashley,

7     according to the Pretrial Services Report, Ashley Hanes, who

8     resides in St. Paul, did say that her brother Mr. Hanes

9     could stay with her, and she would get him to and from his

10    physical therapy, doctor appointments, and so on and so

11    forth.

12         Now, I understand there's a presumption that he

13    remain in custody.  I think it's very apparent that

14    Sherburne County Jail or really any jail facility isn't

15    equipped to meet the very significant needs of Mr. Hanes at

16    this time.  He has sustained very, very serious injuries

17    relatively recently toward the middle part of April.  He has

18    gone through very significant orthopedic surgery.  He's

19    really being held together by orthopedic rods and plates and

20    screws, several, all of his limbs.

21         On one hand, he's very fortunate that the drive-by

22    shooters didn't kill him or didn't shoot -- it could have

23    been worse, I guess.  He could be dead.  However, he is in a

24    wheelchair.  He has very significant medical needs.  The

25    Sherburne County Jail is not equipped.

1          Now, I spoke to Commander Carr late yesterday

2     afternoon.  And, of course, you know, basically he confirmed

3     to me that he told a family member of Mr. Hanes that given

4     all of his needs, he would probably be better off somewhere

5     else, obviously.  Commander Carr told me that if the

6     Marshals order it, you know, they'll do what they can do,

7     but, you know, I went through great detail with Commander

8     Carr yesterday afternoon, what happened to him, what his

9     injuries are, what he needs.

10          And the response was that, you know, obviously,

11     he's going to do what he can do, but he's limited.  He's

12     got, I don't know, a thousand guys locked up out there in

13     terms of state, federal and immigration cases.  I don't

14     know.

15          One individual in a wheelchair with one good arm

16     with a lot of medical, a lot of special needs, individual

17     needs, you know, they're just not -- a jail just isn't set

18     up to provide these kind of needs.  I would urge the Court

19     to seriously consider allowing Mr. Hanes to reside with his

20     sister with an electronic bracelet.

21          He can't run.  He could roll himself down the

22     street I suppose theoretically in a wheelchair, but if he

23     has, you know, what he needs is he needs to have his

24     medication.  He needs to have his physical therapy.  He

25     needs to be followed by his orthopedic surgeon, and he needs

1      to get well and then he can come into court and face the

2      very serious charges that he has pending, but we would urge

3      the Court to, in this particular case, to allow him to, you

4      know, under daily, intent supervision from a pretrial

5      services officer, reporting, calling in, having home visits

6      from the PO, electronic monitoring, only going out when his

7      sister can take him to physical therapy, hospital or doctor

8      office visits, something like that, but he needs to have his

9      diet.  He needs to have his physical therapy.  He needs to

10     have his meds.  He needs to have his medical care and

11     treatment.

12              Thank you, Your Honor.

13              THE COURT:  Ms. Brennan, anything further?

14              MS. BRENNAN:  Yes, Your Honor.  Yes, the

15     government is aware of Mr. Hanes medical condition, his

16     injuries, and the fact that he was shot.  And I have no

17     doubt that it might be better for Mr. Hanes if he was in a

18     different location, but it would not be better for the

19     community and that's what we're focused on, Your Honor.

20              Mr. Hanes is a very dangerous man.  A dangerous

21     man who has been escalating over the last six months.

22     Again, you know, five open felony cases in the state just

23     since November of 2020.  Very, very serious cases.  Four

24     firearms are involved in those cases.  In one case, it's him

25     alleged to have assaulted a woman and tried to run her off

1   the road ramming police cars.  He's a dangerous person, and

2   I think our first responsibility is to protect the community

3   from Mr. Hanes.

4           I would also say, Your Honor, that when we brought

5   Mr. Hanes over from Ramsey County, we did speak with the

6   marshals, and we're assured by the marshals that his medical

7   needs could be met at Sherburne.  The bond report indicates

8   that he has had help from nurses while in Sherburne.

9           Mr. Hanes himself said that the first time he met

10  with a physical therapist in Ramsey County was Thursday,

11  which is the day before he came over to federal custody, so

12  he was in Ramsey for at least a week before he was able to

13  meet with a physical therapist over there.

14          It's going to take a little bit of time to get him

15  what he needs at Sherburne, but he's only been in Sherburne

16  since Friday, and I've had defendants in Sherburne who have

17  been shot, who have been recently discharged from the

18  hospital with multiple injuries.  I mean they are able to

19  deal with it.  And what I would say to the extent that the

20  Court is concerned about this, that we schedule a status

21  conference in a week where we can actually dig down into

22  this and figure out, okay, what do his doctors actually say

23  and what can Sherburne do and what can Sherburne not do?

24  And the government can certainly do some investigating on

25  that and try to figure that out.

1          Obviously, if there's something that he absolutely

2    has to have that Sherburne absolutely can't do, that's a

3    problem.  We would concede that.  I don't think that that's

4    the case, Your Honor.  I think he's basically only been in

5    there over the weekend.

6          He did see a nurse today.  I don't know the exact

7    status of his medications and what he absolutely has to have

8    right now or the status of whether they can get physical

9    therapy into Sherburne, but certainly I would investigate

10   that for the Court and be able to provide the Court with a

11   summary of what they can do and what he needs.

12         And, hopefully, Mr. Hanes would cooperate and help

13   give us access to his medical records so that we can look

14   into that and make sure that everyone is on the same page

15   about what this is.  But I don't think it's safe for

16   Mr. Hanes to be in the community.

17         And I think, unfortunately, statistically

18   speaking, if you look at Mr. Hanes, just his history of

19   arrests and offense conduct, he is exactly the kind of

20   person who is at risk of being a victim of a shooting or

21   being a shooter, statistically speaking.  And another real

22   risk to Mr. Hanes and to the community is that Mr. Hanes

23   would be somebody who might get out of jail and go and try

24   to retaliate against the people who shot him.

25         So I think it's a risk to the community.  I think

1    it's a risk to Mr. Hanes, and I think it's a risk to

2    Mr. Hanes's sister and anybody that he's around if he's

3    released.

4              THE COURT:  Mr. Behrenbrinker or Mr. Hanes, do you

5    want to have a -- I'm going to turn it over to your

6    attorney.

7              THE DEFENDANT:  Yes, yes, yes.  Mr. James, and

8    Your Honor, I just want to say a couple of things real

9    quick.  My sister don't stay in St. Paul at all.

10   Ms. Maribel will tell you where my sister stays at because

11   I'm pretty sure she talks with her.  I think she stays in

12   St. Louis Park or Brooklyn Center, one of them two, and she

13   stays way out of St. Paul.  I'm not even from, you know, I

14   think that's a good place for me to be is to be out of St.

15   Paul, period, you know.

16             MR. BEHRENBRINKER:  Okay.

17             THE DEFENDANT:  And, Your Honor, I'm in so much

18   pain, you know, it's kind of, I'm not trying to be too much

19   TMI, but, Your Honor, I can't even, when I was in the

20   hospital even when I was in Regions, Regions and the

21   Workhouse, Your Honor, I couldn't even wipe my own ass, you

22   know.  Literally, here, here, I don't have my moving board

23   or nothing.  I don't have my moving board to go to the

24   toilet or nothing, so I got to hop over this wheel on my

25   wheelchair, which I could slip, and using my elbow, using my

1    elbow to balance me, you know, because I only have one hand,

2    Your Honor, to balance me, you know, to move forward to the

3    toilet back to my chair, to my Walker to wipe my own ass.

4    You know, I've got to stand up on my walker to wipe my own

5    ass, Your Honor.

6         When I came here, I told the deputies and the

7    nurses, so the question is whose going to wipe my ass,

8    because I can't do it?  Using my left hand, because I've got

9    to lean.  I've got to lean on a toilet, Your Honor.  I can't

10   lean on my right side because I've got rods over here and

11   it's very tender.  I'm talking about very tender.

12        So right now, you know, the whole time I've been

13   in Sherburne County, Your Honor, I have not even moved out

14   of my bed, and I've got bed sores on my ass right now.  They

15   told me to shit.  How do you expect me to shit without a

16   nurse, you know?

17        THE COURT:  Mr. Behrenbrinker, do you have

18   anything?

19        MR. BEHRENBRINKER:  I would just -- thank you,

20   Your Honor.  I appreciate what my client is telling the

21   Court.  I've been doing this work for a while, and I've been

22   dealing with or working out with clients who have been in

23   Sherburne County for a while, and I don't know where the

24   government's lawyer is coming from when Sherburne County

25   just isn't equipped to deal with this kind of a situation.

1      They're just not.  No jail is.  It's unreasonable.  That's

2      why Ramsey County sent him to their workhouse because they

3      are set up.

4            Alternatively, if the Court is not inclined to

5      consider having him under a multitude of conditions reside

6      with his sister Amber.

7            THE DEFENDANT:  Ashley.

8            MR. BEHRENBRINKER:  Or Ashley, I'm sorry, in Saint

9      Louis Park or Brooklyn Center or whatever suburb she lives

10     in.  Perhaps, the Court would consider as an alternative

11     order that he go back to the Ramsey County Workhouse.  My

12     client has testified that when he was at the workhouse, he

13     was getting his diet.  He was getting his medication.  He

14     was getting access to his physical therapy and so on.

15           I've had a multitude of clients at Sherburne and

16     every time they send a note to get a nurse, a doctor is, I

17     don't know what clients the government is working with out

18     there but the medical, they don't have medical staff, the

19     doctors that there are on a daily basis.  They don't have

20     any physical therapists on staff.  They don't have -- they

21     have nurses, part-time LPNs or what have you that come in,

22     but they just, they're not equipped.  They're not set up.

23     That's not their job, where the Ramsey County Workhouse is

24     more set up to deal with the community because they got

25     people coming and going.

76

1          But, in any event, I just -- he's got an extremely

2     serious prior criminal history.  He's facing extremely

3     significant charges here.  But for his physical condition

4     and his medical needs, I wouldn't be making these arguments

5     because I know that he would be detained at Sherburne County

6     Jail for the duration.  My client is waving at me again.

7          THE DEFENDANT:  I just have one thing to say, this

8     is to Your Honor.  Your Honor, I understand I made my

9     mistakes, man, and I made my mistakes before I got shot,

10    but, you know with me getting shot, man, it's the second

11    chance at life.  I'm not going to die.  I got three babies.

12    I got three babies, man, and I got a second chance at life.

13    These shots are killing, they could have hit my main

14    arteries or anything.  I had an angel with me that day to

15    have a second chance at life.

16          I just want to let you know, Your Honor, man, I'm

17    not going to fuck up or nothing man.  I'm sorry for my

18    language.

19          THE COURT:  We're going to have to keep control of

20    this language here.

21          THE DEFENDANT:  I'm sorry, Your Honor.  I'm sorry,

22    it's just -- but I just want to let you know I got a second

23    chance at life, man.

24          THE COURT:  Okay.

25          THE DEFENDANT:  I'm more valuable and more

1    appreciative at the time that I do have here.  I just want

2    to let it go back to my attorney.  I'm sorry, I'm sorry.

3              MR. BEHRENBRINKER:  I appreciate Your Honor's

4    patience allowing my client to express himself in court.

5              We have nothing further, Your Honor.

6              THE COURT:  Ms. Brennan, anything further from the

7    government?

8              MS. BRENNAN:  No, Your Honor.

9              THE COURT:  Okay.  With regard to probable cause

10   and Count I of the Complaint, the Court finds that there is

11   probable cause and the matter will be bound over to the

12   District of Minnesota.

13             With regards to detention, I have considered all

14   the evidence, and I've given consideration and

15   recommendation to Pretrial Services, which recommends

16   detention, based on the evidence I find that the government

17   has met its burden of showing that there's no conditions or

18   combination of conditions which will reasonably assure the

19   safety of the community and the likelihood that the

20   defendant would appear in court.

21             As such, I will order the defendant remain

22   detained until the completion of the case, and he will be

23   remanded to the custody of the United States Marshal.

24             Ms. Brennan, I will ask that you prepare a

25   Proposed Order in this matter.

1          MS. BRENNAN:  Yes, Your Honor.

2          THE COURT:  Okay.  Anything further from the

3    government?

4          MS. BRENNAN:  No, Your Honor, thank you.

5          THE COURT:  Mr. Behrenbrinker?

6          MR. BEHRENBRINKER:  No, Your Honor.

7          THE COURT:  Thank you.

8               (Court adjourned at 4:15 p.m.)

9

10

11          *     *     *     *     *     *

12                 **REPORTER'S CERTIFICATE**

13

14          I, Maria V. Weinbeck, certify that the foregoing is

15    a correct transcript from the record of proceedings in the

16    above-entitled matter.

17

18          Certified by:  *s/ Maria V. Weinbeck*

19                         Maria V. Weinbeck, RMR-FCRR

20

21

22

23

24

25